Filed 5/22/15  P. v. Amio CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>RICHARD M. AMIO et al.,<br><br>　　　Defendants and Appellants. | B249694<br><br>(Los Angeles County<br>Super. Ct. No. BA362872) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Michael E. Pastor, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Richard M. Amio.

John A. Colucci, for Defendant and Appellant Evan S. Samuel.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Los Angeles Police Department (LAPD) Officers Richard M. Amio and Evan S. Samuel were convicted of perjury and conspiring to obstruct justice when their testimony regarding the circumstances leading to the arrest of Guillermo Alarcon was belied by videotaped footage of the event. Appellants challenge their convictions on appeal, citing to insufficient evidence, juror misconduct, evidentiary error, and the trial court's refusal to recuse the entire Los Angeles County District Attorney's Office from prosecuting their case. None of these purported deficiencies warrant reversal. We affirm the judgments.

**FACTS**

Amio and Samuel were members of the Hollywood Gang Enforcement Detail of the LAPD in 2007. On July 6, 2007, at approximately 11:40 p.m., they participated in the arrest of Alarcon for a narcotics violation along with Officer Manuel Ortiz,[1] who also belonged to the Hollywood Gang Enforcement Detail. In the course of their duties, the three officers prepared written reports and offered testimony about the events leading to Alarcon's arrest. At each juncture of the investigation and trial against Alarcon, the three officers provided a consistent story: Amio and Samuel encountered Alarcon while on patrol that night. He ran when they shined their spotlight on him. They gave chase and saw him throw a black item away during the chase. The black item hit a dumpster and broke open, revealing narcotics. Samuel recovered the black item and the narcotics.

At trial, the jury viewed a videotape which showed a different sequence of events. In video taken by the apartment building's surveillance cameras, Ortiz is seen locating the object in a closed condition at a different location and much later than the officers' described. The video tape also contained audio of an officer suggesting, "[b]e creative in your writing," to which another officer responded, "Oh, yeah. Don't worry. Sin duda. . . ."[2] A different officer added, "[h]e ran, threw it and it broke open. . . ." The case against Alarcon was dismissed.

---

[1]     Ortiz was charged alongside Samuel and Amio, but was not convicted.

[2]     The parties stipulated that the Spanish phrase "sin duda" means "no doubt."

Samuel, Amio, and Ortiz were charged on October 6, 2009. A second amended information dated October 18, 2012 contained five counts.[3] In count 1, all three were charged with conspiracy to commit an act injurious to the public health, to public morals, and to pervert and obstruct justice, and the due administration of the laws. (Pen. Code, § 182, subd. (a)(5).)[4] In counts 2 through 5, the officers were charged with committing perjury in the probable cause declaration (Samuel, count 2), at the preliminary hearing (Samuel and Ortiz, count 3), at the motion to suppress hearing (Samuel and Amio, count 4), and at trial (Samuel and Amio, count 5). (§ 118, subd. (a).)

The codefendants were tried together from October 17, 2012 to November 6, 2012. The prosecution presented evidence of each defendant's role during the investigation: Amio prepared the incident report; Samuel prepared the affidavit of probable cause to arrest Alarcon;[5] Samuel and Ortiz testified at the preliminary hearing; Samuel and Amio testified at the suppression motion hearing; and all three testified at Alarcon's trial. Relevant portions of their trial testimony were read to the jury in the present matter along with their testimony at Alarcon's preliminary hearing and motion to suppress. Because their statements were consistent throughout the hearings, reports, and trial, we will only set forth their trial testimony below.

The jury in this case heard Samuel testify at Alarcon's trial that he and Amio had been partners for approximately one year at the time of Alarcon's arrest. They were driving southbound on Ardmore Street in a marked patrol car on July 6, 2007, at approximately 11:40 p.m. when they recognized Alarcon standing in front of an apartment building, looking up and down the street. Samuel and Amio had encountered

---

[3]    Additional counts of perjury and conspiracy against Ortiz were alleged in a separate third amended information dated September 25, 2013. The jury could not reach a verdict as to Ortiz and the court declared a mistrial.

[4]    All further statutory references are to the Penal Code unless otherwise specified.

[5]    An affidavit of probable cause is prepared in each case an arrest is made without a warrant.

3

Alarcon twice before. They once detained him because they believed him to be a suspect in a crime, but he was later let go.

They shined a spotlight on him and he appeared startled. He then immediately turned and fled through a walkway to the back of the building. Amio gave chase. They observed a black object in his right hand as he ran. Alarcon turned the corner into the carport behind the building with Amio in pursuit. Samuel also engaged in pursuit after he parked the patrol car. They observed Alarcon shut the door to a laundry room of the building and throw the black object away from him. It hit the dumpster and broke open. Alarcon attempted to hide behind the lone car parked in the carport. Alarcon was detained by Samuel and Amio. At that point, Samuel "took a better look at the object that [Alarcon] had thrown, and it appeared to be broken open . . . from him throwing it. And it appeared to be paper bindles which are consistent as a way of holding a powdered narcotics substance." The box held 12 bindles and what appeared to be rock cocaine. Alarcon was arrested for possession of cocaine for sale. Afterwards, four or five other people came out of the apartment building. Samuel called for additional units to assist them for purposes of officer safety. Ortiz was one of those responders.

Amio's trial testimony was also read to the jury in this case and it duplicated Samuel's. Amio testified he and Samuel were on patrol on July 6, 2007, in an area with high narcotic activity. Thus, they were suspicious when they spotted Alarcon looking up and down the street. They shined the spotlight on him and he turned to flee to the back of the building. Amio exited the patrol car and gave chase. According to Amio, he was at most 1 to 2 seconds behind Alarcon during the chase. Amio also noticed a small black object in Alarcon's hand. As they ran toward the back of the building, Amio saw Alarcon slam a door closed and throw the object he had in his hand to his right. The object hit the dumpster and cracked open. Alarcon was detained and later arrested. Amio testified Samuel picked up the object that had been thrown. They called for backup for officer safety and Ortiz was one of the officers who responded. Amio denied Ortiz was the one who found the black box. Amio confirmed he wrote the police report and included all of the events leading up to the arrest in it. Samuel testified he reviewed

4

Amio's report many times and did not believe there were any important facts missing from it.

Before the end of Amio's trial testimony, Alarcon's trial attorney disclosed the existence of a video recording of Alarcon's arrest. Amio and Samuel had denied all of the discussions and events shown in the video during their testimony. The 28-minute video depicted Alarcon's arrest, during which Alarcon told Samuel he was "tired of getting harassed all fucking year." Samuel responded, "Well, I already told you, I'll keep doing that if you keep playing. Remember what I told you last time? I gave you some courtesy, right?"

The officers then tried to get a key to the laundry room because they believed Alarcon threw something in there. Samuel threatened to "break the door open if you don't give me the key." Samuel also asked a visitor, Miguel Cortez, if he had a key to the laundry room. Cortez replied he did not since he did not live there. When they were able to enter the laundry room, they began a search for the object. At some point, Ortiz found a key holder in the carport near the dumpster, but it was closed. The officers discussed how to open it, with one suggesting, "fucking pry it open." After it was opened, the officers confirmed it was narcotics. By then, there were several officers at the scene. They engaged in the following conversation:

"[Officer Jim Tumbeiro]: Be creative in your writing.

[Unidentified officer]: Oh, yeah. Don't worry. Sin duda (without a doubt).

[Unidentified officer]: Beautiful.

[Unidentified officer]: Come on, this is a man who put a case on somebody who has no dope (laughing). And he's doing time . . . (unintelligible laughing) two years.

[Unidentified officer]: He's felony dropping the dope.

[Unidentified officer]: Yeah . . . gonna want the container.

[Unidentified officer]: (inaudible) The D.A. will fucking us that.

[Unidentified officer]: Known to be on probation . . .

[Unidentified officer]: He ran, threw it and it broke open . . .

[Unidentified officer]: Door open . . .

[¶] . . . [¶]

[Unidentified officer]: It's coke.

[Unidentified officer]: Yeah, it's enough. It better be: I don't know. There's nothing else in there, right; No money?

[Unidentified officer]: Did he have money on him?

[Amio]: You know what? He was fucking walking back. He was like this. I saw him on (unintelligible)."

The jury also heard testimony from Alarcon's family members. Maria Alarcon, his sister, and Maria Chavez, his mother. Maria Alarcon testified the apartment building had four security cameras hooked up to a television with a video recorder. Two cameras showed different angles of the parking area, one showed the front of the apartment, and one showed the walkway. While the security cameras were always on, the video recorder was not and someone had to press record on the VCR to activate it. On the night of Alarcon's arrest, Alarcon's sister heard her dog barking so she immediately put in a cassette and recorded the video feed from the security cameras. She then heard Alarcon yelling not to open the door. Sometime later, Samuel came to their door and asked for the keys to the laundry room. When Alarcon was released after his arrest, his sister told him that he needed to see the video she had recorded. Maria Alarcon denied editing or changing anything on the videotape.

Maria Chavez, Alarcon's mother, was the building manager at the time. She lived in one apartment with Alarcon's sister while Alarcon lived with his wife in a separate apartment in the same building. Alarcon asked his mother for the videotape after he was released. When they found it on a shelf in her living room, Maria Chavez marked the video with an "M" to distinguish it from the others.

Alarcon testified that he was in front of his apartment building that night. He had turned to walk back to the carport when the police shone a spotlight on him. He continued walking to the carport and was followed by Samuel and Amio, who handcuffed and arrested him. Alarcon testified he made copies of the videotape and sent the original

6

to Mexicali for safekeeping because he was afraid the LAPD officers were "going to retaliate." He was originally confused as to which was the original tape, but his mother told him she put an "M" on the original. He believed the Gang Enforcement Detail was targeting and harassing him, particularly after his arrest. Approximately two weeks before his criminal trial, Ortiz was among a group of officers who stopped Alarcon to search him and take pictures of his tattoos. Additionally, Amio pulled Alarcon over and asked him about accepting a plea prior to his trial.

Lieutenant Stacy Spell from the LAPD's Internal Affairs Investigation Division was assigned to lead the investigation into the officers' conduct. Spell examined the key holder in question and opined the container had irregular marks that appeared to be a result of someone attempting to pry it open with a sharp object. Spell also received a VHS tape from the deputy public defender who represented Alarcon at his trial. Spell reviewed the video footage of Alarcon's arrest and prepared a transcript of the recording. Because Alarcon made several copies and initially did not know which one was the original, the FBI and the LAPD received several copies of the video which proved not to be the original. An original of the tape was eventually sent to the FBI. At trial, an expert on audio and video electronics opined that the video at issue was an original recording.

The defense presented evidence of inconsistencies between Alarcon and his sister's trial testimony and their prior statements to the LAPD and prosecutors. Specifically, Alarcon told a prosecutor assigned to investigate the charges against the defendants that he had gone into the laundry room to hide from the police officers. His sister also told the investigator that she was watching TV when she heard her dog barking. When she looked outside and saw police officers, she went into the bedroom and pressed the record button on the surveillance system. In her testimony, Alarcon's sister said she could not recall telling the prosecutor that she looked outside and saw police before she began the recording. John Fede, a forensic analyst and electronic technician, testified as the defense expert. Fede opined the original tape had been very heavily edited, but on cross-examination, acknowledged there were no edits within the pertinent 28-minute portion of videotape at issue, only before and after.

7

The defense also presented testimony from Officer Lance Perkins, who had been assigned to the LAPD's Hollywood Division of the Gang Enforcement Detail in 2007. Perkins testified he and his partner responded to the call for backup on the night of Alarcon's arrest. Perkins had recently obtained a "universal key" from a locksmith who told him it would open any lock. Perkins used the opportunity of the locked laundry room door to try it out. When he arrived at the apartment complex, there were several officers already there. Perkins did not find the officers acting unusually or secretively. The defense also presented testimony from Sergeant Duane Aikens and retired Lieutenant Charles Wampler. They were both veterans of the LAPD and had been involved in the Gang Enforcement Detail in particular. They testified to the character of the defendants and opined the officers acted appropriately in ensuring the investigation was complete and no possible firearms or narcotics was missed.

Officer Jim Tumbeiro testified he was Ortiz's partner in 2007. They responded to a call for additional units on the night in question. After briefly speaking with Samuel, the officers began to search the area for additional evidence. Tumbeiro testified his comment, "Be creative in your writing" was meant as a joke. He did not observe any of the defendants acting in a secretive or unusual manner. The defense also presented character testimony for each of the defendants. Each witness testified to the integrity and honesty of the defendants.

The jury found Amio and Samuel guilty as charged. The trial court suspended sentence and placed Samuel on probation for three years. He was ordered to perform 750 hours of community labor and pay a $1,000 restitution fine pursuant to section 1202.4, subdivision (b), among other fees and fines. The trial court also suspended sentence and placed Amio on formal probation for three years. He was ordered to perform 500 hours of community labor and pay a $600 restitution fine pursuant to section 1202.4, subdivision (b), among other fines and fees. Amio and Samuel both timely appealed and we consolidated their appeals on February 26, 2014.

**DISCUSSION**

Although Amio and Samuel have submitted separate briefs, there is considerable overlap among the issues they raise. Indeed certain portions of their briefs are identically worded. Moreover, each has joined in any issues raised by the other. We therefore address both appeals in one opinion. We find none of the issues raised warrant reversal.

**I.      Sufficiency of the Evidence**

Appellants first contest the sufficiency of the evidence to show a conspiracy to obstruct justice, contending there was no direct evidence Samuel or Amio agreed to "any devious plan to falsely accuse Alarcon of drug possession." Appellants appear to argue that Samuel's statements on his declaration of probable cause were merely cut and pasted from Amio's police report, and were not an agreement to commit perjury. Moreover, Appellants' perjured testimony at trial "most likely w[as] independently contemplated and committed to protect their fellow officers, not to promote a conspiracy."

The scope of our review for whether evidence is sufficient to support a conviction is a very narrow one. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We will not disturb the trier of fact's determination of the credibility of witnesses and the truth or falsity of the facts on which that determination depends. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Instead, we review the entire record in the light most favorable to the verdict and determine whether there is evidence that is reasonable, credible, and of solid value such that a reasonable juror could find the defendant guilty beyond a reasonable doubt. (*People v. Davis* (1995) 10 Cal.4th 463, 509.) Circumstantial evidence may be sufficient to prove the defendant's guilt beyond a reasonable doubt. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

"[A] conspiracy requires an intentional agreement to commit the offense, a specific intent that one or more conspirators will commit the elements of that offense, and an overt act in furtherance of the conspiracy." (*People v. Johnson* (2013) 57 Cal.4th 250, 266.) "The elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.' [Citations.] To prove an agreement, it is not necessary to establish the parties

9

met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024-1025.)

We find ample circumstantial evidence to support Appellants' convictions. Here, Appellants were partners and members of the same specialized unit within the LAPD, the Hollywood Division Gang Enforcement Detail. They were present and active participants in the search. The video shows the officers engaged in a discussion which could reasonably be seen as an agreement about how to document the arrest and discovery of narcotics. When Tumbeiro suggested, "[b]e creative in your writing," other officers immediately replied, "known to be on probation" and "[h]e ran, threw it and it broke open. . . ." Although it is unclear whether Amio or Samuel made any of those comments, they were there, they listened to the comments without objection, and applied the suggested story to their later testimony. This story—that Alarcon was on probation, he ran, threw an object, and it broke open to reveal narcotics—is repeated consistently by Amio and Samuel in the police report, in the declaration of probable cause, at the preliminary hearing, at the hearing on the motion to suppress, and at trial. In fact, a comment made by an unidentified officer indicated this was not a new scenario to them since one of them had "put a case on somebody who has no dope . . . And he's doing time . . . two years." While Tumbeiro testified his suggestion to be creative was a joke, the jury was not required to accept his testimony and could draw its own conclusions. The conclusion it reached was reasonable. Appellants' attempts to interpret the evidence differently does not warrant a reversal of the conviction.

## II.     Juror Misconduct

### A. Background

After the jury returned its verdicts, Samuel moved for a new trial based, in part, on juror misconduct. Amio joined. The basis for the juror misconduct rested on a declaration by Juror No. 8, who contacted Ortiz's trial attorney after the jury verdict. Juror No. 8 reported: "During the course of jury deliberations, Juror #7 said 'I dislike the

10

LAPD. I distrust them. In fact, I distrust all law enforcement'. This is an exact quote of what Juror #7 said In [*sic*] deliberations. [¶] I brought this up to that Juror and asked why you didn't exclude yourself. The rest of the jury said it didn't matter to them. I was the only one to raise this issue in the jury room."

At the hearing on the new trial motion, the trial court found Juror No. 8's declaration established a prima facie case of prejudice and invited the parties to move to unseal confidential juror information to conduct an evidentiary hearing on the issue. In a later written order, the trial court reversed its position and found the statements attributed to Juror No. 7 to be hearsay and to have failed to establish a prima facie case of misconduct. However, the trial court admitted the declaration for the sole purpose of supporting the new trial motion and allowed the defense to subpoena Juror No. 8 to testify under oath.

Juror No. 8 testified she contacted Ortiz's attorney shortly after the verdict because she was the hold out juror for Ortiz. She stated she was sorry to have caused a mistrial, but she could not vote him guilty because she "believed it was a copy/paste error." Juror No. 8 recalled the jurors deliberated well and tried to pay attention through the first few days of deliberations. Nevertheless, she felt "buillied in that jury room" and "felt like the lone duck." At some point, Juror No. 7 offered to write down all the issues and points raised about each count on the white board.

While the jury considered the perjury count against Samuel, the foreperson asked for a moment to go through one of the stipulations. In the ensuing lull, Juror No. 11 made a comment to which Juror No. 7 replied, she disliked the LAPD and distrusted them. The following day, Juror No. 8 confronted Juror No. 7 about her statement, asking: "How dare you. Why didn't you exclude yourself when you said you dislike all LAPD, all law enforcement." Things became "emotional" and Juror No. 8 admitted she "got loud." At that point, the other jurors told her to settle down. Juror No. 8 felt she was "being bombarded and being threatened." Juror No. 7 made no further comments about the LAPD.

11

The trial court found a prima facie showing of juror misconduct had been made. Letters were sent to Juror Nos. 7 and 11, requesting they come in to testify. Both jurors testified. Juror No. 7 denied saying she disliked the LAPD, but admitted she said she distrusted them; she explained, "What led to it was I believe we were looking at video, and I believe this person didn't want to look at it, or use it, or refer to it. [¶] So it was—we had some heated discussions. And I said I would use video. As a matter of fact, I don't trust anybody. I don't trust LAPD. I don't trust anybody. I would use video, too. [¶] And those were the words I recall saying. And within the context of trying to move the deliberations on forward and saying how I would do something if I, you know, needed to prove, I'd use a camera. I'd use a video. I'd use whatever to substantiate what is going on in something. That's how this came about."

Juror No. 7 further indicated she had no bias against the LAPD and truthfully affirmed during voir dire that she could be fair to LAPD officers. She recalled the juror who confronted her as a smoker who did not appear to like Juror No. 7. Her comments were made because the juror who had confronted her did not want to view the videotape or rely on it. Juror No. 8 was trying to make her understand that in that situation, "I'm not going to trust the police. I'm going to trust the videotape." Juror No. 11 did not recall any juror stating a distrust of the LAPD or law enforcement.

The trial court denied the motion for new trial, finding there was no juror misconduct on the part of Juror No. 7 and the presumption of prejudice had been overcome. Noting there may have been a personality dispute between the two jurors, it expressly found Juror No. 7 credible and Juror No. 8 not credible. Because Juror No. 8 had demonstrated remorse for appellants' convictions, it had "serious questions about the credibility of [Juror] No. 8."

**B. Applicable Law**

A juror's duty is to weigh the evidence with impartiality and to reach a fair and unbiased verdict. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484.) A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *People v. Nesler* (1997) 16 Cal.4th

12

561, 578 (*Nesler*).)  An impartial juror is someone "capable and willing to decide the case solely on the evidence" presented at trial.  (*Smith v. Phillips* (1982) 455 U.S. 209, 217; *In re Carpenter* (1995) 9 Cal.4th 634, 648, 656.)  A new trial under section 1181 is warranted if a juror's actual bias was concealed and not discovered until after the verdict.  (*Nesler, supra,* at p. 581.)  What constitutes "actual bias" of a juror varies according to the circumstances of the case.  (*Ibid*.)

In assessing whether a juror is "impartial" for federal constitutional purposes, the United States Supreme Court has stated:  "Impartiality is not a technical conception.  It is a state of mind.  For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."  (*United States v. Wood* (1936) 299 U.S. 123, 145-146.)  " 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' [Citation.]"  (*Irvin v. Dowd* (1961) 366 U.S. 717, 722-723, quoting *Reynolds v. United States* (1878) 98 U.S. 145, 155.)

Once the defendant establishes juror misconduct has occurred, a rebuttable presumption of prejudice is created.  (*In re Carpenter, supra,* 9 Cal.4th at p. 657; *People v. Majors* (1998) 18 Cal.4th 385, 417.)  The presumption of prejudice may be rebutted by an affirmative evidentiary showing "or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct."  (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)  On appeal, deference is given to the trial court's factual findings and credibility determinations if supported by substantial evidence.  (*People v. Danks* (2004) 32 Cal.4th 269, 304.)  However, the determination whether juror misconduct was prejudicial presents a mixed question of law and fact " 'subject to an appellate court's independent determination.' "  (*Id*. at p. 303.)

### C. Analysis

Here, the trial court found a rebuttable presumption of prejudice had been raised as a result of Juror No. 8's testimony.  The trial court made express findings about the credibility of Juror Nos. 7 and 8 in reaching its ruling that the presumption had been

rebutted. Appellants challenge the trial court's credibility determination, arguing it was not based on substantial evidence. In making their argument, Appellants merely attempt to reweigh the evidence and re-determine credibility. For example, Appellants contend that the context surrounding Juror No. 7's comments "does not ring true." We accept the trial court's credibility determinations and findings. (*Nesler, supra,* at p. 582.) Substantial evidence supports the trial court's ruling.

Indeed, Appellants acknowledge Juror No. 7's "testimony may have provided some evidence to support the court's findings." This evidence includes the entirety of Juror No. 7's testimony, which provided the context for her statements. Juror No. 7 made the comments while trying to make a point about the weight to be given to the video. Juror No. 8's testimony does not contradict Juror No. 7's account. It merely repeated her comments out of context. There was no juror misconduct.

Appellants further contend the trial court erred in failing to compel Juror No. 3 and the foreperson to appear and testify. The trial court has wide discretion to conduct an evidentiary hearing to resolve allegations of juror misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 418-419.) It did so here and made factual findings and credibility determinations, which we accept. The trial court was not further obligated to conduct additional hearings with other jurors as a " 'fishing expedition' to search for possible misconduct." (*Id.* at p. 419.)

Appellants have provided no evidence that any other juror's testimony would further elucidate Juror No. 7's comments. Despite Appellant's contention that a further hearing involving other jurors "was required to fully flush out the true facts," there is no evidence anyone other than Juror No. 8 heard the comments at issue. Juror No. 11, who purportedly prompted Juror No. 7's comments, could not recall hearing any juror state he or she distrusted the LAPD. There was no indication that any other juror participated in the conversation. There was also no indication the comments were stated in any context other than what Juror No. 7 described. In short, there was no dispute about what happened. The comments attributed to Juror No. 7 by Juror No. 8 were not prejudicial and did not show bias. Any arguments to the contrary are speculation.

This matter is very different from *People v. Castorena* (1996) 47 Cal.App.4th 1051, a case relied upon by Appellants. There, one juror was accused of not deliberating by a group of other jurors. However, she contended it was just an excuse for them to push her out because the jury was deadlocked 11-1 on the matter. The trial court refused to conduct a hearing regarding the hold-out juror's allegations. The appellate court found this to be an abuse of discretion. (*Id.* at p. 1066.) There was a dispute as to what actually happened, necessitating an evidentiary hearing. (*Id.* at pp. 1064-1066.) Here, an evidentiary hearing was conducted and the trial court made its findings, which we accept.

## III.   Admission of Officer Tumbeiro's Comment

Appellants next contend it was error for the trial court to admit Tumbeiro's comment to "be creative in your writing" and the response by an unidentified officer, "Sin duda [no doubt]." Prior to trial, Samuel moved to exclude the two comments on the ground they were inadmissible hearsay. In the alternative, he sought a jury instruction that the statements should not be admitted for their truth. Amio joined in the motion. The People argued Tumbeiro's statement and the response were admissible as nonhearsay and as hearsay exceptions under Evidence Code sections 1221 and 1223.[6]

The trial court held a hearing on the motion to exclude the evidence. It allowed admission of the contested statements on the grounds articulated by the People. Noting that it did not need to determine at that point in the proceedings whether there was proof

---

[6]   Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

Evidence Code section 1223 relates to the admissions of a co-conspirator . It states, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

beyond a reasonable double of a conspiracy, only whether a prima facie case of one had been made, the trial court believed that "at the time of any alleged statement of Officer Tumbeiro, 'Be creative in your writing,' that literally could be the first statement as part of a statement in furtherance of a conspiracy and can demonstrate the opening salvo in terms of any agreements that any defendant may have had with regard to following up on that direction." Likewise, the "sin duda" comment was a part of the existence of a conspiracy. The trial court further held that Tumbeiro's statement was admissible as a nonhearsay command or order and as an adoptive admission under section 1221 of the Evidence Code. As a result of the trial court's ruling, no limiting instruction was required. On appeal, Samuel[7] contends there is no basis for the trial court's ruling. We disagree.

"Hearsay evidence is of course generally inadmissible. Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' [Citation.]" (*People v. Hardy* (1992) 2 Cal.4th 86, 139; Evid. Code, § 1223.)

"Only prima facie evidence of a conspiracy is required to permit the trial court to admit evidence under the coconspirator's exception. This fact need not be established beyond a reasonable doubt, or even by a preponderance of the evidence. . . . The conspiracy may be shown by circumstantial evidence and 'the agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute.' " (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1402-l403.)

---

**7**  Although Amio failed to raise this issue in his brief, he expressly joined in the issues raised by Samuel.

16

We review a trial court's evidentiary order for abuse of discretion and find none. (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)

As discussed above, substantial evidence supports a finding beyond a reasonable doubt that a conspiracy to obstruct justice existed. This is more than sufficient to establish a prima facie case of conspiracy. The same evidence supports a finding that Appellants later participated in the conspiracy by committing perjury on the witness stand and in the declaration of probable cause. Tumbeiro's "be creative in your writing" comment and the "sin duda" response were both made in furtherance of the objective of the conspiracy.

That neither Tumbeiro nor the unidentified officer were charged in the conspiracy is irrelevant. Samuel has failed to, and we have not found, any legal support for the proposition that the declarant must also be charged as a coconspirator in order for the exception to apply. Neither do we credit Samuel's argument that the comments at issue were made prior to any conspiracy being formed. According to Samuel, the earliest point a conspiracy could have formed was when Amio prepared a false report. Not so. That was merely an overt act committed in connection with the conspiracy, not its beginning. The trial court reasonably interpreted Trumbeiro's comments as the "opening salvo" to the conspiracy. As a result, this case is distinguishable from *People v. Jurado* (2006) 38 Cal.4th 72, 117-118, where a codefendant's hearsay statement that she needed a gun was made one or two days before the three codefendants reached any agreement to kill the victim.

Because we find both statements to be admissible as a statement by a coconspirator, we need not address the remaining grounds for admissibility identified by the trial court—that Trumbeiro's statement was a nonhearsay command or order and that it fell under the adoptive admission exception under Evidence Code 1221.

## IV. Recusal of District Attorney's Office

Samuel's last argument, to which Amio also joins, is that the trial court erred in failing to recuse the entire prosecutor's office on his section 1424 motion. Samuel's motion to recuse was based on the failure of the Los Angeles County District Attorney's

17

Office to oppose Alarcon's motion for a finding of factual innocence under section 851.8[8] without further investigating the authenticity of the videotape. Samuel argued that the circumstances of the case demonstrated a reasonable possibility that the district attorney's office may not exercise its discretionary function in an even handed manner. Appellants' alleged the perjury embarrassed the office and created an incentive for the district attorney to make an example out of them. Thus, Samuel sought to either disqualify the entire prosecutorial office or conduct an evidentiary hearing to amplify the record on the decision making process to not oppose the factual innocence motion and dismiss Alarcon's case. The trial court summarily denied the motion, finding Samuel had failed to establish the existence of a conflict of interest or that any conflict was so grave as to render it unlikely that any defendant would receive fair treatment.

The California Supreme Court has articulated the standards for a section 1424 ruling and our review of it on appeal as follows:

> "Section 1424, subdivision (a)(1) provides, in part, that a motion to recuse the district attorney 'may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.'

> "In interpreting this section, we have held that a 'conflict' exists, for purposes of section 1424, 'whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citation.] Moreover, 'there is no need to determine whether a conflict is "actual," or only gives an "appearance" of conflict.' (*Ibid.*)

---

[8]     As noted by Samuel, the parties mistakenly cited section 851.6, a provision relating to certificates describing arrest without warrant as a detention, in the papers below. In fact, section 851.8 is the correct section dealing with factual innocence. It provides in relevant part: "In any case where a person has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred, the defendant may, at any time after dismissal of the action, petition the court that dismissed the action for a finding that the defendant is factually innocent of the charges for which the arrest was made." (§ 851.8, subd. (c).)

"However, the mere existence of a conflict, by itself, is not sufficient to require recusal of the district attorney. [Citation.] Section 1424 does not authorize disqualification merely because the defense has shown that the prosecutor's involvement 'would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' [Citation.] Instead, it is defendant's burden to allege facts which, if credited, establish (1) a "conflict of interest," and (2) that the conflict is "so grave as to make a "fair trial" unlikely.' [Citation.] 'Thus, the first half of the inquiry asks only whether a "reasonable possibility" of less than impartial treatment exists, while the second half of the inquiry asks whether any such possibility is so great that it is more likely than not the defendant will be treated unfairly during some portion of the criminal proceedings.' [Citation.]

"As previously described, the statutory procedure established by section 1424 prescribes a two-stage process. At the first stage, the defendant must file a notice of motion containing 'a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party,' and those allegations must be supported by 'affidavits of witnesses who are competent to testify to the facts set forth in the affidavit.' (§ 1424, subd. (a)(1).) In opposition to the motion, the district attorney and the Attorney General may also file affidavits. (*Ibid*.) After considering the motion and affidavits, the trial court then decides whether or not the second stage, an evidentiary hearing, is necessary. (*Ibid*.) An evidentiary hearing may be ordered if the defendant's affidavits establish a prima facie case for recusal—that is, if the defendant's affidavits, if *credited*, would require recusal. [Citation.]" (*Packer v. Superior Court* (2014) 60 Cal.4th 695, 709-710 (*Packer*).)

A trial court's decision whether to hold an evidentiary hearing is reviewed for an abuse of that discretion. (*Packer,* at p. 710.) Under this standard of review, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary

19

and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

Applying this standard, we find no abuse of discretion in the trial court's decision to reject Samuel's section 1424 motion without an evidentiary hearing. Samuel presented no evidence to establish a prima facie case that the district attorney's office was embarrassed and wanted to create an example of them. Samuel's affidavits merely established that deputy district attorneys would be material witnesses in his case. "It is well settled that merely because an employee may be a potential witness and credibility of that witness may have to be argued by the prosecuting attorney, there is no sufficient basis for that reason alone to recuse an entire prosecutorial office. [Citations.] This rule has been applied even to cases wherein one or more deputy district attorneys are witnesses." (*People v. Merritt* (1993) 19 Cal.App.4th 1573, 1580; *People Ex. Rel. Younger v. Superior Court* (1978) 86 Cal.App.3d 180, 211 [without more, recusal of the entire prosecutorial office is not justified even if a deputy from that office testifies as a material witness].) Thus, the fact that the deputy district attorneys involved in Alarcon's case may testify as material witnesses is insufficient grounds for recusal of the entire office.

Acknowledging he has a "heavy burden," Samuel nonetheless contends he has demonstrated a prima facie case for recusal. In particular, "the prosecution was locked into filing charges" once the decision was made not to oppose Alarcon's factual innocence petition. Further, "[t]here would be a strong urge to make an example of the appellants for embarrassing the prosecutor's office and an overwhelming desire to distance the office from appellants to avoid being embroiled." Samuel's contentions lack any factual support.

His section 1424 motion was submitted with the interview summaries of Deputy District Attorney Liza Tom, the trial prosecutor at Alarcon's trial, and Deputy District Attorney Robert Wallace, Tom's acting supervisor. The summaries disclosed Tom's and Wallace's involvement in the trial against Alarcon. They did not disclose the decision to file criminal charges against Appellants. This is because Tom and Wallace were not

involved in that decision. Lieutenant Spell conducted the investigation concerning Appellants and the decision to prosecute them was made by Deputy District Attorney Hassett, who was assigned to a separate section of the district attorney's office. In short, there was no indication the prosecutor's office charged Appellants because it intended to make an example of them or that it was embarrassed by Appellants' criminal actions.

Further, there was no evidence Deputy District Attorney Tom did not properly dismiss the case against Alarcon, given the state of the evidence, or that she failed to oppose the factual innocence motion for an improper reason. The video footage clearly showed the officers' account of events to be false. The subsequent discussion – including Tumbeiro's comment to "be creative" and the suggestions that "he was on probation[,]" "he ran, threw it and it broke open. . . " – are sufficient to warrant dismissal of the charges against Alarcon. There was no indication the videotape was fabricated and, indeed, the defense expert admitted at trial that the relevant 28-minute segment in the middle of the tape was not edited in any way.

The cases cited by Samuel are inapposite. In each, the prosecutors were not only witnesses, but circumstances inherent to those cases made it more likely that the prosecutor's office could not be impartial. In *People v. Conner* (1983) 34 Cal.3d 141 (*Conner*), for example, a deputy district attorney witnessed the defendant attempt an escape by taking the deputy sheriff's revolver and shooting the deputy. The defendant also shot at, but missed, the deputy district attorney. The deputy district attorney discussed the event with many of the personnel at the Santa Clara County District Attorney's Office and with the news media. The entire office was recused although the new deputy district attorney assigned to prosecute the crime was not in the same unit. (*Id.* at p. 145.)

In upholding the recusal, the Supreme Court found substantial evidence supported the trial court's determination there was a conflict of interest due to "the dramatic and gripping nature of the circumstances, the pervasiveness of the communications regarding [the deputy district attorney's] relationship to the incident, and the difficulty in gauging their cumulative effect." (*Conner, supra*, at p. 148.) Substantial evidence also supported

21

a finding the conflict was so grave as to render it unlikely the defendant would receive fair treatment given the small size of the office, the deputy district attorney's communications with his coworkers, the seriousness of the incident, and the sheriff's deputy's injuries. (*Ibid.*)

In *Packer, supra,* 60 Cal.4th at page 695, the Supreme Court found the trial court abused its discretion when it failed to order an evidentiary hearing upon the petitioner's section 1424 motion to recuse the lead prosecutor in the case. The petitioner submitted affidavits showing the prosecutor knew the victim, whom the petitioner allegedly raped and stabbed to death, through the prosecutor's ex-wife. The prosecutor's children were also potential witnesses because they knew the petitioner and his daughter had dated the petitioner's friend. (*Id.* at p. 711.) There were clear factual disputes regarding how often the petitioner socialized with the prosecutor's children at the prosecutor's house, the extent of the prosecutor's interference in pretrial investigation, and whether he interfered in the service of a subpoena to his daughter. (*Id.* at p. 714; see also *People v. Gamache* (2010) 48 Cal.4th 347 [victim employed by the district attorney's office]; *People v. Superior Court* (*Greer*) (1977) 19 Cal.3d 255 [victim's mother employed by district attorney's office].)

Here, the circumstances underlying the crime are not nearly as "dramatic" and "gripping" as those in *Conner* nor as personal as those in *Packer.* Indeed, it would appear that officer misconduct is a common enough occurrence in Los Angeles County that an entire division specializes in those types of cases. Neither is the Los Angeles County District Attorney's Office composed of 25 attorneys, like the Santa Clara County District Attorney's Office in *Conner.* The decision to prosecute Appellants was made by a specialized unit. Unlike in *Parker* and *Conner,* Samuel has presented no evidence to establish a prima facie case the District Attorney relied on improper grounds in prosecuting them.

Anticipating our conclusion, Samuel argues he was entitled to use compulsory process to uncover the necessary evidence. He contends the procedures set forth in section 1424 violate his right to compulsory process and due process under the

Constitution by conditioning the right to an evidentiary hearing on a showing made solely through affidavits.

The United States Supreme Court has explained, "[c]riminal defendants have the right under the Compulsory Process Clause to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 56.) However, the right to compulsory process has only been applied as a trial right and has never been extended to pretrial proceedings. (*Ibid.*) Noting it is not at all clear " 'whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial discovery rights to the accused[,]' " the California Supreme Court has declined to take "a long step in a direction the United States Supreme Court has not gone." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1126-1127; *People v. Webb* (1993) 6 Cal.4th 494, 517-518.) Despite Samuel's urging, we also decline to assume a pretrial right to compulsory process which both the United States Supreme Court and the California Supreme Court have been reluctant to confer.

## DISPOSITION

The judgments are affirmed.


                                           BIGELOW, P.J.

We concur:


RUBIN, J.


FLIER, J.